IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BURCH MICHAEL BOWEN,

    Petitioner,                    No. CIV S-06-2425 FCD GGH P

M. KRAMER, et al.,

    Respondents.            FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1989 petitioner was convicted of second degree murder with use of a firearm and sentenced to 15 years to life for the murder conviction and two years for the firearm enhancement. Answer, Exhibit 1. In this action, petitioner challenges the 2005 decision by the California Board of Parole Hearings (BPH) finding him unsuitable for parole on grounds that the decision was not supported by sufficient evidence. The 2005 hearing was petitioner's second subsequent suitability hearing.

        After carefully reviewing the record, the court recommends that the petition be denied.

/////

1

II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

On February 27, 2006, the Yuba County Superior Court issued a reasoned opinion denying petitioner's habeas petition raising the same claims which are raised in the instant action. Answer, Exhibit 3.  Petitioner filed habeas petitions in the California Court of Appeal and California Supreme Court which were summarily denied.  Id., Exhibits 5, 6.  When reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

/////

/////

1  III. <u>Factual Summary</u>

2         A factual summary of petitioner's offense taken from the probation report was

3  recited at petitioner's suitability hearing:

> On January 17th, 1989, approximately 2:00 a.m., Joy Freedle, that's spelled F-R-E-E-D-L-E, called Yuba County Sheriff's Office on (indiscernible) apparent suicide near 008 Feather River Boulevard. At approximately 2:00 a.m., officers responded and were met by Walter Loper. Mr. Loper directed officers and emergency medical personnel to the bed of Glenda Jean Thomas. The body was located in a camper trailer on the property of the Feather River residence. Officers found the victim's body lying across the bed of the trailer with the feet resting on the floor. The victim was fully clothed. There was a pool of blood under her head. A .30-caliber M1 Carbine rifle bearing serial number 484911 was lying on the bed approximately 18 inches from and parallel with the victim's body. The weapon was located on her right side. The barrel of the Carbine was in the same direction as the victim's head and had no blood on the barrel. At 2:21 a.m. medical personnel examined the victim's body and pronounced her dead. It should be noted that the victim resided in the trailer with her boyfriend who is the defendant Burch Bowen. Investigations conducted at the scene of the crime indicated that at approximately 1:15 a.m., Loper was awakened by the sound of a gunshot. He went to the trailer to investigate the sound and called officers of the Yuba County Sheriff's Department. The victim's body was removed from the bed, the .30-caliber M1 Carbine cartridge case was found in the (indiscernible). It was believed to have been under the victim's body. Also located at the scene was a .22 caliber rifle and two hypodermic syringes. A further examination of the victim's body indicated a hole approximately 3/8ths of an inch diameter apparently (indiscernible). No powder or, quote, "tatooing,' closed quote, was (indiscernible) of the wound. Officers contacted Terry Thomas, the victim's estranged husband. Mr. Thomas informed the officers that the defendant had made numerous threats against his wife's life if she did not divorce Mr. Thomas. Mr. Thomas indicates that the victim had never attempted suicide or even discussed it. On January 17th, 1989, at approximately 1:15 p.m., an autopsy was performed by Dr. Charles. It was determined that the victim had a (indiscernible) hemothorax, a lacerated left (indiscernible) artery from a gunshot wound. Interviews conducted by detectives revealed that the defendant had made numerous threats to shoot people and that he and the victim had been arguing the day of the shooting. It should be noted that the toxicology report dated January 30th, 1989, indicated that the victim had methamphetamine in her body. On January 18th witnesses were reinterviewed by investigating officers. They stated to officers that they had not been (indiscernible) statements to investigating officers. It was determined that the defendant was with the victim at the time of her death and was involved in her death in some way. The defendant had instructed witnesses to provide him with an alibi. Defendant had instructed witnesses to inform Yuba County Sheriff's Office that the death was a suicide. Re-interview with Mr. Loper indicated that Bowen had told him that he had killed the victim. He (indiscernible) officers were present and returned to the scene after they had left. They instructed to Mr. Loper to state that he and the victim had argued on the day and that the defendant had left and gone fishing. Loper indicated to detectives that he had driven Bowen–or had given Bowen a ride to a

residence in Olivehurst. Finding no one there, they went to a second residence. Finding no one there, they returned to the scene of the crime. It should be noted that the defendant took a 12 pack of beer from the scene of the crime. After returning to the crime scene, defendant informed Loper that he wanted to get syringes from the trailer. He did no reenter the trailer. Defendant reportedly informed Loper that if anyone found the syringes, he was to say that they belonged to friends of Ms. Thomas. Loper then drove the defendant to an unmarked address on Aborga, spelled A-R-B-O-R-G-A, Road. Defendant–detective subsequently received an anonymous phone call that the defendant was driving a black van bearing California license place 1NL-NML945. On January 20th, 1989, at approximately 2:00 p.m., an arrest warrant was issued for the defendant for violation of section 187 of the California Penal Code. Defendant was subsequently arrested on January 24th, 1989, at approximately 8:10 a.m. He was arrested at 891 Grand Avenue in Linda, California. At January 24th, at approximately 10:40 a.m., defendant was interviewed at the Yuba County Sheriff's Office. Defendant stated that he and the victim had argued during the day and the victim had left. He went to sleep for approximately five hours. The victim came back and woke him up. The victim and the defendant engaged in minor verbal argument. Defendant stated that the victim informed him that if she could not live [sic] him, she would commit suicide. He left the trailer and after approximately 40 to 60 seconds he heard a gunshot. The defendant went on to state that he reentered the trailer. Victim was still sitting on the bed, leaning over on her side with the rifle propped between her legs. The defendant then indicated that he laid the victim on the bed, placing her on her back. The defendant then stated he told–he felt partially responsible for Ms. Thomas's death, closed quote. Then indicated he was going to, quote, 'turn himself in,' closed quote. He went on to say that he was afraid to turn himself in because, quote, he was afraid he was going to be shot by officers at the Yuba County Sheriff's Office. The defendant then–the defendant then changed the story scenario in which he was in the trailer and the shot was fired from the rifle. This version had the victim picking up two rifles as the defendant attempted to get the gun away but before he reached her, the victim shot herself. He then admitted that he requested the others to provide him with an alibi. The third version indicated that his hand was on the gun when the firearm was discharged. The final version he placed the gun on the floor between the victim's legs when it went off. During the course of the investigation, it was ascertained victim [sic] had made numerous death threats against individuals in the community in the past. The various people that gave statements to the police had indicated that they were afraid of the defendant and that is why they were not truthful during the initial investigation. It should be noted that the bullet traveled in a left to right direction through the victim's throat. The bullet severed the spinal cord of the victim, making it impossible for the weapon to be placed on the bed next to her. Further investigation is indicated that the victim was, quote, 'going to leave the defendant,' closed quote, therefore the theory of suicide on the victim's part seems impossible because she was not despondent, as the defendant claimed. Also there was no blood on the rifle barrel. As noted earlier in this document there were no powder burns which are common in suicides.

Answer, Exhibit 2, pp. 10-19.

/////

IV. Discussion

Since the approximate five years since the issuance of McQuillion v. Duncan, 306 F.3d 895 (9th Cir. 2002), we know this about the liberty interest implicated by California's parole laws regarding indeterminate sentences, i.e., parole suitability hearings, which if successful for the petitioner, will result in the establishment of an actual parole date (but never less than the minimum term):

   1. A liberty interest exists, Irons v. Carey, 479 F.3d 658 (9th Cir. 2007) citing cases;

   2. Reliance on unchanging factors in denying parole suitability *might* implicate a violation of that liberty interest. Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003);

   3. A finding by the Board of Parole Hearings (formerly BPT) (or at a later time, by the Governor) concerning the circumstances or gravity of the crime in and of itself is sufficient to deny suitability; In re Rosenkrantz, 29 Cal. 4th 616, 682, 128 Cal. Rptr. 2d 104, 161; Irons, at *5; but the nature of the offense must be "particularly egregious" to constitute a basis to deny parole suitability. Rosenkrantz, 29 Cal. 4th at 683, 128 Cal. Rptr. 2d at 161.

   4. However, "particularly egregious" means nothing more than finding elements in excess of those "minimally necessary to convict." In re Dannenberg, 34 Cal. 4th 1061, 1095, 23 Cal. Rptr. 3d 417, 440 (2005);

   5. If the petitioner has served less than the minimum term of his indeterminate sentence, "all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." Irons at *5, but see footnote 1 of Irons expressing no opinion if the prisoner has served more than his minimum term, i.e., *maybe* that is the time frame against which reliance on unchanging factors is truly suspect[1];

---

[1] Nothing in California statutes or regulations, see Cal. Penal Code 3041, 15 CCR § 2402, would expressly so limit the decision of the BPH and Governor, thus the potential

6. If the BPH determined that the crime was vicious, or performed in a callous manner, or the motive was trivial, and so forth – all factors relating to the circumstances of the crime – and such is adopted by the state courts on review, a federal court must find the state court decision(s) AEDPA-unreasonable before a writ of habeas corpus may be granted. Irons, supra.

With respect, after Irons, the undefined "mights" and "maybes" serve as an indecipherable present guide to knowing just when the liberty interest in parole may be violated by reliance on unchanging factors. Moreover, one does not know whether such reliance, if it is ever held to be insufficient, is based on passage of time alone, or is an uncertain blend of crime circumstances and passage of time. The state courts' adoption of the BPH (BPT[2]) or Governor's decision about the circumstances of the crime is now essentially unreviewable – at least prior to the expiration of the minimum term. That is, the circumstances of the crime in terms of viciousness, callousness, triviality and the like, is essentially an unchanging value judgment whose correctness cannot often be disputed regardless of the time when such a judgment is made – right after the conviction, just prior to expiration of a minimum term, well after the expiration of a minimum term.[3]

---

limitation must be of federal origin. However, as undue reliance on unchangeable factors has never been found thus far by the Ninth Circuit, the commencement point of the limitation, or the precise blend of crime circumstances and years since, has not been defined. We do know that in Irons, five times of application was insufficient. Irons did not decide that reliance on unchanging factors after the minimum term had been served was unlawful. We simply know that "maybe" that will be the case.

[2] The Board of Prison Terms recently had its name changed to the Board of Prison Hearings.

[3] The undersigned has previously determined the arbitrary nature and lack of predictive value generally found in a circumstances of the crime parole suitability denial based on unchanging circumstances despite the passage of sixteen years and more from the date of the conviction coupled with an unblemished prison record. See Irons v. Warden of California State Prison-Solano, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005). That analysis, focusing on the predictive nature of the crime for future violence in combination with expert psychiatric reports or other forward looking evidence, has been cited with approval by the California Court of Appeal. In re Elkins, 144 Cal. App. 4th 475, 50 Cal. Rptr. 3d 503, 522 (2006); In re Scott, 133 Cal. App. 4th 573, 34 Cal. Rptr. 3d 905 (2005). However, since that analysis only received the comment that it was an "understandable [AEDPA] error" in the concurrence of Judge Reinhardt,

Review of the federal appellate cases demonstrates that no guided finding of undue reliance on unchanging factors can be made in this case. Biggs v. Terhune, supra, the case that commenced the discussion on unchanging factors, involved the first degree bludgeoning murder of a witness facilitated, but not committed, by Biggs. He was denied parole eligibility at his initial hearing in 1999 in part because of the gravity of the crime. All might agree that such a murder was grave, and it will never be properly classified as anything but such. Nevertheless, the Ninth Circuit found that "continued reliance" on unchanging factors could violate due process. Although not stating such, the intimation of Biggs was that the third or fourth time of reliance on the circumstances of the crime would be too much. Certainly, it was not understood by the undersigned from reading Biggs that the time at which continued reliance would be too much would occur in 2010 – the time at which Biggs will have served his minimum term. Biggs' minimum term is served in 2010, and Biggs will have had approximately 5 or 6 more hearings by that time. However, subsequent Ninth Circuit cases have not upheld the undersigned's reading of Biggs.

In Sass, no comparison review of other cases was undertaken, there was simply the one sentence holding that the "evidence of Sass' prior offenses [prior DUIs] and the gravity of his convicted offenses [DUI resulting in a death and injury] constitute some evidence to support the Board's decision." Id., 461 F.3d 1123; the dissent disagreed, and found AEDPA unreasonableness. The Ninth Circuit was reviewing a third denial of suitability. If jurists of the Ninth Circuit cannot agree whether the circumstances of the crime can constitute some evidence given three hearings, how will the BPH or the undersigned know when to stop using the circumstances of a crime as the reason to deny parole eligibility. What will be the analytical watershed point of departure from routinely upholding the BPH assessment of the circumstances of the crime, and more importantly, why? Will the fourth hearing be sufficient, or should it be

---

that analysis concerning the trigger time of undue reliance will not be utilized herein.

8

the seventh?  Will the analysis simply hinge on the non-analytical fact that Sass will have passed his minimum terms of years under his sentence?  Would a later BPT finding of egregiousness be AEDPA unreasonable simply because Sass just passed his minimum term as opposed to just before the expiration of his minimum term?  None of these questions have been answered.

In <u>Irons</u>, after five parole suitability hearings, the Ninth Circuit determined that the second degree murder of a perceived thieving drug dealer by a wildly shooting, and then stabbing, angry "victim" of the deceased was comparatively more egregious than the murder in <u>Sass</u>.  Perhaps so; perhaps other jurists would locate this line in another position because of the societal impact that drunk drivers impose in this country.  Both positions have their points.  But one can validly question whether the ultimate goal of every parole eligibility hearing, determining *future* safety of the community, can forever be based on personal judgments on the comparative seriousness of crimes committed decades ago.

Nevertheless, taking an implied cue from <u>Irons</u> that the minimum term might serve as an analytical change point, the undersigned finds that prior to that time, absent extraordinary circumstances, the BPH determination on factors relating to the circumstances of the crime are essentially unreviewable, i.e., the determination constitutes "some evidence" sufficient to deny parole eligibility (suitability).

Cal. Code of Regulations, section 2402(a) provides that regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

Cal. Code of Regulations, section 2402(c), sets forth the circumstances tending to show unsuitability.  The court lists those of significance here:

> (1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:

/////

/////

9

  (A) Multiple victims were attacked, injured or killed in the same or separate incidents.

  (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style manner.

*****

  (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

  (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

  (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

  (3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

  In the instant case, the BPH relied on two factors regarding the commitment offense to find petitioner unsuitable for parole: 1) the offense was carried out in a dispassionate and calculated manner (§ 2402(c)(1)(B)); 2) the motive for the offense was inexplicable or trivial (§ 2402(c)(1)(E)).  Answer, Exhibit 2, pp. 68-70.

  At the time of the 2005 suitability hearing, petitioner, convicted in 1989, had not served his minimum term of 15 years.  The circumstances of petitioner's offense, as reflected in the two factors regarding the commitment offense relied on by the BPH, are more than "minimally necessary" to support petitioner's conviction.  Under this de minimis threshold, the Superior Court was not unreasonable in finding that the BPH's decision finding petitioner unsuitable was supported by some evidence.   Because circumstances of the crime alone can constitute some evidence when the petitioner has served less than his minimum term, there is no point in discussing the other factors of parole suitability.[4]

---

[4] Rosenkrantz also required that the then BPT also make an individualized consideration of the other factors regarding parole suitability.  Of course, the Commissioners always make such a determination as the Commissioners know that they must.  Whether these determinations are supported by some evidence is another matter, but as long as the consideration is made, the

The denial of petitioner's claim challenging the sufficiency of the evidence to support the 2003 decision by the BPH finding him unsuitable for parole by the Yuba County Superior Court was not an unreasonable application of the due process law surrounding parole suitability hearings.

*Conclusion*

If the undersigned were reviewing this matter on a clean slate, the undersigned would not analyze the liberty interest involved merely by reference to a checklist of crime circumstances and whether the BPH understood that a murder was serious.  Nevertheless, no binding authority at present would require more than use of the checklist for the circumstances of the crime factors as "some evidence" upon which to deny parole suitability.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 6/20/07

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

bowen.157

---

circumstances of the crime are sufficient to deny suitability.

11